UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL ORR, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  No. 1:24-cv-00054-SEB-MG |
| BYRD, et al., | ) ) ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Michael Orr, who was formerly incarcerated by the Indiana Department Correction ("IDOC") at Wabash Valley Correctional Facility ("WVCF"), alleges that his necessary medical care was delayed by Dr. Byrd and Centurion under the theory recognized in *Monell*. The defendants have moved for summary judgment. Dkt. [31]. For the reasons below, their motion is **GRANTED**.

**I.**
**Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not

"scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Mr. Orr failed to respond to the summary judgment motions. Accordingly, facts alleged in the motions are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all relevant times, Mr. Orr was an inmate at WVCF. Dkt. 32-1 at 35-39.

Defendant Dr. Samuel Byrd works for Centurion Health of Indiana as a physician at WVCF. Dkt. 32-3 at 1 (Byrd Aff.). Centurion Health of Indiana, LLC ("Centurion") is the IDOC's contracted healthcare services provider.

### B. IDOC Policy

Inmates with chronic conditions that are considered "stable" are expected to be scheduled one time per year for a chronic care clinic visit. Dkt. 32-4 at 2. If an offender wishes to see the provider or other health services in between chronic care clinic visits, they are to submit a healthcare request form ("HCRF"). *Id.* Scheduling for chronic care visits is handled by nursing staff, not the physician, at WVCF. Dkt. 32-3 at ¶6-7.

### C. Mr. Orr's Medical Care

On September 10, 2021, Mr. Orr transferred to WVCF and the next day, he submitted a HCRF alleging that he had not eaten in 24 hours. Dkt. 32-1 at 34-39. On September 16, Mr. Orr submitted another HCRF advising that he had now missed 18 meals over six days, that the officers were not logging his refused meals properly, and he wanted staff to know how long he had been fasting. *Id.* at 96. In response, WVCF medical staff began assessing Mr. Orr's condition every day and attempted to educate him on the dangers of long-term fasting. *Id.* at 14-23. Mr. Orr continued to refuse food and fluids until, on September 22, he was found to be unresponsive and was sent to the Terre Haute Regional Hospital. *Id.* at 10-13.

While at the hospital, Mr. Orr was treated for dehydration, acute kidney injury, and starvation ketoacidosis. *Id.* at 26-33. On September 23, Mr. Orr returned to WVCF and had begun eating and drinking regularly again. *Id.* at 24-25. Almost immediately, however, Mr. Orr declared another hunger strike. *Id.* at 95.

On September 24, Mr. Orr submitted an HCRF complaining that he had not been assessed despite having missed four meals and claiming he needed "medical attention before I pass out again and die this time." *Id*. On September 26, he was placed in the infirmary for IV fluids and close observation. *Id*. at 52-56. Dr. Byrd saw Mr. Orr in the infirmary the next day and noted that Mr. Orr's reports of being too nauseated to eat did not align with his behavior. *Id*. 65-68. Dr. Byrd surmised that Mr. Orr may have been malingering for a medical diet and prescribed anti-nausea medication. *Id.* at 67.

Non-party Nurse Barbara Riggs noted that Mr. Orr refused to take the anti-nausea medicine when it was offered to him and again refused to eat, this time claiming he had no appetite. *Id*. at 73. She documented that Mr. Orr seemed "fixated on the diet that he was receiving at the hospital." *Id.* Nurse Riggs informed Mr. Orr that he would be discharged from the infirmary if he continued to refuse all care. *Id.* at 74. Mr. Orr responded that he did not care, he was not going to eat. *Id*. Mr. Orr was discharged from the infirmary on September 28. *Id.* at 92-93.

Dr. Byrd noted that Mr. Orr showed no signs of dehydration, and his lab results were within normal limits. *Id*. at 79. Dr. Byrd documented that he had been told that Mr. Orr claimed to not have a purpose for hunger striking, yet asked when offered any sustenance whether his acceptance would constitute the end of his hunger strike. *Id*. Nurse Riggs also observed that Mr. Orr would decline the food and drink items that would "break" his hunger strike and ask for other items instead. *Id*. at 85.

Nurse Riggs noted that his reasoning for not eating would change frequently: prior to his hospitalization, Mr. Orr claimed he had been too depressed to eat; on September 27, it was due to nausea; September 28, it was due to no appetite; and September 29, it was due to acid reflux. *Id*.

4

at 15, 85. When Nurse Riggs advised Mr. Orr that the acid reflux was a result of his empty stomach, he asked for a food sack, yet refused to accept it from the custody officer. *Id*.

On September 29, Dr. Byrd noted that Mr. Orr had lost thirty pounds within the prior ten weeks. *Id*. at 90. In an effort to get Mr. Orr back on track and to avoid another hospitalization, Dr. Byrd ordered a high-protein diet with a high protein sack for ninety days. *Id*. at 90, 94. On October 4, Dr. Byrd addressed Mr. Orr's ongoing conditions of hypertension and asthma, which were both noted to be under control, and Mr. Orr's complaint of pain with eating after long periods of fasting. *Id.* at 43-46. Dr. Byrd also ordered labs to be drawn. *Id*. at 46.

On October 25, Mr. Orr submitted an HCRF complaining of shooting pain from his elbows through his forearms, wrists, hands, and fingers related to "cubital tunnel syndrome" and requested a nerve conduction study. *Id.* at 97.

Over the next year, Mr. Orr submitted eleven HCRFs: one was a request for labs after a hunger strike, one was a request for renewal of his high protein diet order, and the rest were related to unrelated physical and mental health issues. *Id.* at 102-103. Over the same twelve-month period, Mr. Orr was seen for nurse visits on 27 different dates, many for daily hunger strike assessments. *Id.* at 136-172.

On October 9, 2022, Mr. Orr filed a grievance, alleging that "[t]oday, I learned that the delay in chronic care clinic or follow-up visits by Dr. Byrd deviates from the standard of care." Dkt. 32-2 at 1. However, there is no record that Mr. Orr requested or inquired about an appointment for a chronic care visit during any of these face-to-face encounters with nursing staff. Dkt. 33 at 7. Upon receipt of this grievance, WVCF's Health Services Administrator, Sara Bedwell responded that Mr. Orr had been added to the provider's schedule for the following week. Dkt. 32-2 at 3. Additionally, the grievance specialist, Shelby Crichfield, responded to Mr. Orr that his chart had

been reviewed and he would be seen by a medical provider "very soon." Dkt. 32-2 at 5. On November 21, 2022, Mr. Orr saw non-party Nurse Practitioner Victoria Crawford for a chronic care visit. Dkt. 32-1 at 3-6. Mr. Orr admitted during the visit that two of his complaints, chest pain/shortness of breath and GERD symptoms, resulted from his own anxiety and frequent hunger strikes. *Id.* at 6. Mr. Orr's chronic conditions did not change in any significant way from October 4, 2021, to November 21, 2022. Dkt. 32-3 at ¶10-11.

## III.
## Discussion

### A. Medical Defendants

#### 1. Dr. Byrd

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. Orr's hunger strike issues were objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Dr. Byrd acted with deliberate indifference—that is, that he

6

"consciously disregarded a serious risk to [Mr. Orr's]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Orr "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

The undisputed facts show that Dr. Byrd provided significant assessment and treatment of Mr. Orr's hunger strike issues. When Mr. Orr first was released from his hospital stay, Dr. Byrd visited Mr. Orr, assessed his condition, prescribed him medication and found that he appeared to be attempting to obtain a specific medical diet. Dkt. 32-1 at 65-68. When continued tests did not reveal abnormalities related to dehydration, Dr. Byrd continued to monitor Mr. Orr in the chronic care clinic and ordered additional medication and testing. *Id.*

In an effort to get Mr. Orr's health back on track after he continued to lose weight and to avoid another hospitalization, Dr. Byrd continued treatment in September of 2021 and ordered a high-protein diet with a high protein sack for Mr. Orr for ninety days. *Id*. at 90, 94. Dr. Byrd continued to see Mr. Orr for chronic care clinic visits and continued to monitor his condition throughout October of 2021 with additional labs ordered. *Id.* at 43-46. Further, Mr. Orr's chronic conditions were considered "stable," and IDOC policy dictated that he was to be seen in the chronic care clinic once yearly unless he requested to be seen sooner. Mr. Orr never submitted an HCRF to advise nursing staff that he was due for an appointment with Dr. Byrd or that he was experiencing any issues related to his chronic conditions.

Based on these facts, no reasonable jury could conclude that Dr. Byrd departed from professional standards, persisted in a course of treatment that wasn't working, unnecessarily delayed Mr. Orr's care, or failed to follow the specialist's instructions. Dr. Byrd is therefore entitled to summary judgment on Mr. Orr's claims.

### 2. Centurion

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978)). To state a *Monell* claim, the plaintiff must identify an action taken by the municipality and allege a causal link between the municipality's action and the deprivation of federal rights. *Dean,* 18 F.4th at 235. "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019).

"Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (cleaned up). Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id*. (cleaned up). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* (cleaned up). Under this theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id*. (cleaned up).

Mr. Orr alleges that Centurion had a policy and practice of delaying care to chronic care clinic patients. Dkt. 1 at ¶18. But the designated evidence demonstrates that Mr. Orr had frequent visits with nurses, Dr. Byrd, and medical staff regarding his chronic conditions. Further, although there may have been a brief delay in his scheduling for his chronic care clinic visits, the record reflects that once Mr. Orr filed a grievance requesting a visit, this was quickly remedied, and he was placed back on the schedule. There is no evidence from which a reasonable jury could conclude that any delay in treatment was evidence that Centurion had a larger policy, practice, or custom that resulted in the delay of chronic care scheduling. Centurion is therefore entitled to summary judgment on Mr. Orr's claims.

## IV.
## Conclusion

The Defendants' motion for summary judgment, dkt. [31], is **granted**. Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 3/2/2026

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MICHAEL ORR
2911 Angela Drive
Indianapolis, IN 46203

All Electronically Registered Counsel